UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

JOSE GUADALUPE PEREZ-
FARIAS, JOSE F. SANCHEZ,
RICARDO BETANCOURT, and all
other similarly situated persons,

    Plaintiffs,

    v.

GLOBAL HORIZONS, INC., *et al.*,

    Defendants.

NO.  CV-05-3061-RHW

**FINDINGS OF FACT AND
CONCLUSIONS OF LAW ON
PLAINTIFFS' CLAIMS
AGAINST GROWER
DEFENDANTS; ORDER
ADDRESSING GLOBAL'S POST-
TRIAL MOTIONS**

Before the Court are four Motions for Judgment as a Matter of Law (Ct. Recs. 791, 794, 797, and 799).  A hearing on the motions was held on December 17, 2007.  Plaintiffs were represented by Lori Isley, Mirta Contreras, and Richard Kuhling.  The Defendant Global Horizon and Mordechai Orian were represented by Chrystal Bobbit and Gary Lofland.  Defendants Green Acre Farms and Valley Fruit were represented by Ryan Edgley and Brendan Monahan.

On September 27, 2001, the jury found that Defendant Global Horizons, Inc. and Mordechai Orian violated the Farm Labor Contractors Act, Section 1981, and the Washington Law Against Discrimination.  Judgment was entered on October 23, 2007, in favor of Plaintiff Ricardo Betancourt for $5,099.50 in lost wages and $2,500.00 for emotional distress; in favor of Plaintiff Jose Sanchez for $492.20 in lost wages and $5,000.00 for emotional distress; in favor of Plaintiff Jose G. Perez-Farias for $4,000.00 for emotional distress; in favor of the Denied Work subclass

**FINDINGS OF FACT AND CONCLUSIONS OF LAW ON PLAINTIFFS'
CLAIMS AGAINST GROWER DEFENDANTS; ORDER ADDRESSING
GLOBAL'S POST-TRIAL MOTIONS ~ 1**

in the amount of $100,000.00 for punitive damages; in favor of the Green Acre subclass in the amount of $100,000.00 for punitive damages, and in favor of the Valley Fruit subclass in the amount of $100,000.00 in punitive damages (Ct. Rec. 767).

### DISCUSSION

In their Motions for Judgment as a Matter of Law, Defendants Global Horizons, Inc. and Mordechai Orian make the following arguments: Defendant Mordechai Orian cannot be held individually liable for the discrimination claims; the damages against the absent class members cannot stand because there was no op-out notice sent to the absent class members; Plaintiffs failed to produce a legally sufficient evidentiary basis to find Global liable for discrimination; Plaintiffs failed to produce a legally sufficient basis to find Global liable for emotional distress; and Plaintiffs failed to prove that they were entitled to back pay because they failed to prove they could legally work in the United States.

**1.    Standard of Review**

The Court reviews motions for judgment as a matter of law under the standard set forth in Fed. R. Civ. P. 50(a).[1]  The Court may grant a motion for

---

[1]Plaintiffs argue that Defendants failed to timely make a Rule 50(a) motion, therefore they are precluded from making a post-trial motion for judgment as a matter of law.  There is a limited exception to the rule that the sufficiency of the evidence is not reviewable on appeal unless a motion under Rule 50(a) is made to the trial court.  The Ninth Circuit has recognized such an exception where there is "plain error apparent on the face of the record that if unnoticed, would result in a manifest miscarriage of justice."  *Yeti by Molly Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1109 (9th Cir. 2001).  "This exception, however, permits only extraordinarily deferential review that is limited to whether there was *any* evidence to support the jury's verdict, irrespective of its sufficiency."  *Id.* (citations omitted);

**FINDINGS OF FACT AND CONCLUSIONS OF LAW ON PLAINTIFFS'
CLAIMS AGAINST GROWER DEFENDANTS; ORDER ADDRESSING
GLOBAL'S POST-TRIAL MOTIONS ~ 2**

judgment as a matter of law if "the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party" on the issue.  Fed. R. Civ. P. 50(a); *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150 (2000).  In doing so, "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence."  *Reeves*, 530 U.S. at 150 (citations omitted).  "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge."  *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).   The court is required to review the entire evidentiary record, but it must disregard all evidence favorable to the moving party that the jury is not required to believe.  *Id.*  "The court should give credence to the evidence favoring the nonmovant as well as that 'evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses.'" *Id.* (citation omitted).

A jury verdict must be upheld if it is supported by substantial evidence. *Wallace v. City of San Diego*, 479 F.3d 616, 624 (9th Cir. 2007).  "Substantial evidence is evidence adequate to support the jury's conclusion, even if it is also possible to draw a contrary conclusion from the same evidence."  *Id.*  Judgment as a matter of law may be granted only where, in viewing the evidence in the light most favorable to Plaintiff, the evidence permits only one reasonable conclusion, and that conclusion is contrary to the jury's verdict.  *Id.*

The standards for granting a new trial is set forth in Fed. R. Civ. P. 59.  The Court may grant a new trial "for any of the reasons for which new trials have

*but see Nitco Holding Corp. v. Boujikian*, 491 F.3d 1086 (9th Cir. 2007) (holding that failure to file a Rule 50(b) motion precludes a later challenge to the sufficiency of the evidence on appeal).

**FINDINGS OF FACT AND CONCLUSIONS OF LAW ON PLAINTIFFS' CLAIMS AGAINST GROWER DEFENDANTS; ORDER ADDRESSING GLOBAL'S POST-TRIAL MOTIONS** ~ 3

1   heretofore been granted[.]"  Fed. R. Civ. P. 59.  Those reasons include when "the
2   verdict is contrary to the clear weight of the evidence, or is based upon evidence
3   which is false, or to prevent, in the sound discretion of the trial court, a miscarriage
4   of justice." *Silver Sage Partners, Ltd. v. City of Desert Hot Springs*, 251 F.3d 814,
5   819 (9th Cir. 2001) (internal quotation omitted); *see also Union Oil Co. of Cal. v.*
6   *Terrible Herbst, Inc.*, 331 F.3d 735, 742 (9th Cir. 2003) ("trial court may grant a
7   new trial only if the jury's verdict was against the clear weight of the evidence.").
8   When, however, the new trial motion is based on insufficiency of the evidence, a
9   "stringent standard" applies, and the motion should be granted only if the verdict
10  "is against the great weight of the evidence or it is quite clear that the jury has
11  reached a seriously erroneous result." *Johnson v. Paradise Valley Unified Sch.*
12  *Dist.*, 251 F.3d 1222, 1229 (9th Cir. 2001) (internal quotation omitted).

13      Although the trial court may weigh the evidence and credibility of the
14  witnesses, "the court is not justified in granting a new trial merely because it might
15  have come to a different result from that reached by the jury." *Roy v. Volkswagen*
16  *of Am., Inc.*, 896 F.2d 1174, 1176 (9th Cir.1990) (internal quotation omitted); *see*
17  *also Union Oil Co.*, 331 F.3d at 743 ("It is not the courts' place to substitute our
18  evaluations for those of the jurors."); *Silver Sage Partners*, 251 F.3d at 819 (a
19  district court may not grant a new trial simply because it would have arrived at a
20  different verdict).

21      The Court has reviewed the transcript of the trial.  There are three instances
22  where Defendants approached the issue of judgment as a matter of law.

23      First, on September 9, 2007, on the eve of trial, the Global Defendants filed
24  a Motion for Judgment on the Pleadings (Ct. Rec. 701).  The Global Defendants
25  argued that Plaintiff's claims under the Migrant and Seasonal Agricultural Worker
26  Protection Act ("AWPA") and the Washington state Farm Labor Contractor Act
27  ("FLCA") are preempted by federal law—specifically, the H-2A statute and
28  regulations.  On the first day of trial, the Court declined to rule on the motion at

**FINDINGS OF FACT AND CONCLUSIONS OF LAW ON PLAINTIFFS'
CLAIMS AGAINST GROWER DEFENDANTS; ORDER ADDRESSING
GLOBAL'S POST-TRIAL MOTIONS ~ 4**

that time.  At the end of the day on September 18, 2007, counsel for the Global Defendants again brought the pending motion to the Court's attention, but the Court did not rule on the motion.  This motion addresses a legal question, and will be addressed below.

On the morning of September 18, 2007, after the Court heard argument regarding Plaintiff's exhibits and after the jury had been seated, counsel for the Global Defendants asked that before she begin her opening statement, she be permitted to make a motion for a directed verdict.  The Court ruled that such a motion was untimely, given that the jury was already seated.  The Court stated that any motion for a directed verdict should have been made the previous night or before the jury was seated.[2]

Later on, after the jury had been excused for the day, counsel for the Global Defendants sought to make an oral motion challenging the sufficiency of the evidence.  The Court stated that motions challenging the sufficiency of the case should have been made at the end of Plaintiff's case and found that the motions were untimely, but took the motions under advisement.  The Global Defendants argued that the evidence was insufficient to establish racial discrimination.

Under Fed. R. Civ. P. 50 and 52, the oral motions made on September 18, 2007, were timely.  Rule 50(a)(2) states that the motion for judgment as a matter of law may be made at any time before the case is submitted to the jury.  Rule 52(c) only requires that a party be fully heard on an issue.  Notwithstanding this, the Global Defendants never presented, during any stage of the trial, the argument that the evidence was insufficient to support the damages award for emotional distress, and that Plaintiffs failed to prove they were entitled to back pay because they failed

---

[2]The day before, on September 17, 2007, the Court excused the jury early due to the unavailability of the Grower Defendants' witnesses.

**FINDINGS OF FACT AND CONCLUSIONS OF LAW ON PLAINTIFFS' CLAIMS AGAINST GROWER DEFENDANTS; ORDER ADDRESSING GLOBAL'S POST-TRIAL MOTIONS ~ 5**

to prove that they could legally work in the United States, as set forth in their motions for judgment as a matter of law. Nonetheless, the Court will review the motions under the substantial evidence standard because the Global Defendants may have been misled by the Court's statement that the motions were untimely.

**2.    Sufficiency of the Evidence of Racial Discrimination**

Shortly before trial, the parties stipulated to a jury trial for all issues involving the Global Defendants and a non-jury trial for all issues involving the Grower Defendants. Plaintiffs contended that the Global Defendants discriminated against the Plaintiff sub-classes on account of race and this issue was submitted to the jury. The jury found against the Global Defendants and the Global Defendants have moved for judgement not withstanding the verdict.

Against the Grower Defendants, the Plaintiffs contended that the Global Defendants discriminated against the Plaintiff sub-classes on account of race and that the Grower Defendants are liable as joint employers for any discrimination against the Plaintiff sub-classes committed by Global. For the claim against the Grower Defendants, the Court has to decide the same issue tried to the jury, *i.e.* did the Global Defendants discriminate against the Plaintiff sub-classes on account of race. If the Court concludes that the Global Defendants did so discriminate, the Court has to decide the second question, namely, whether the Grower Defendants were joint employers and therefore liable for the Global Defendant's discrimination. The Plaintiffs and the Grower Defendants presented these two issues for decision by the Court.

For the reasons that follow, the Court denies the Global Defendant's Motion for Judgment Notwithstanding the Verdict and grants judgment of dismissal of the claims for racial discrimination against the Grower Defendants.

To establish a claim under § 1981 the plaintiff must prove that he or she was subjected to intentional discrimination based upon his or her race, rather than

**FINDINGS OF FACT AND CONCLUSIONS OF LAW ON PLAINTIFFS' CLAIMS AGAINST GROWER DEFENDANTS; ORDER ADDRESSING GLOBAL'S POST-TRIAL MOTIONS ~ 6**

solely on the basis of the place or nation of their origin. *Pavon v. Swift Transp. Co., Inc.*, 192 F.3d 902, 908 (9th Cir. 1999). To establish a claim under the Washington Law Against Discrimination, the plaintiff must prove that national origin or race was a substantial factor in the defendant employer's decision not to hire, to terminate, or otherwise discriminate against the plaintiff. *Zhang v. American Gem Seafoods, Inc.*, 339 F.3d 1020, 1034 (9th Cir. 2003), *citing* 6A Wash. Prac. Wash. Pattern Jury Inst. WPI 330, 01 (4th ed. 2002); *see also Mackay v. Acorn Custom Cabinetry*, 127 Wash. 2d 302, 310 (1995).

### A.    Findings of Facts and Conclusions of Law on the Discrimination Claims Asserted Against the Grower Defendants

Congress created a program whereby employers that needed workers could hire foreign workers if there were not enough local workers to do the work. *See* 8 U.S.C. § 1101(a)(15)(H)(ii), § 1188, and 20 C.F.R. § 655, *et seq.* The program goes by the acronym H-2A. Defendant Global Horizons is a labor contractor that uses foreign workers pursuant to the H-2A program to fill temporary labor shortages in the agricultural field. The Global Defendants contracted to supply labor to the Grower Defendants, pursuant to the H-2A program.

While there are many details to the program that are too lengthy to recite, the heart of the program is the requirement that the employer must offer work to local workers and hire local workers first before offering work to foreign workers. Only if insufficient numbers of local workers qualify for the job can the employer hire foreign workers.[3]

---

[3]Under this statutory and regulatory regime, agricultural employers who anticipate temporary domestic labor shortages may petition the Attorney General for authorization to utilize the services of H-2A workers. See 8 U.S.C. § 1188(a)(1); 20 C.F.R. § 655.101. Prior to Attorney General approval, the employer must successfully apply to the Secretary of the United States Department of Labor

**FINDINGS OF FACT AND CONCLUSIONS OF LAW ON PLAINTIFFS' CLAIMS AGAINST GROWER DEFENDANTS; ORDER ADDRESSING GLOBAL'S POST-TRIAL MOTIONS ~ 7**

1       In this case, two sub-classes of local workers were formed. The first class

2   are local workers that claim that they were qualified to work, but were not hired by

3   the Global Defendants. The second class were local workers that were hired by the

4   Global Defendants, but claim they were fired in violation of their contract to work.

5       On Motion for Summary Judgment (Ct. Rec. 507) and at a jury trial, the

6   Global Defendants were found to have failed to hire qualified local workers and to

7   have fired qualified local workers in violation of their contract. Those findings are

8   supported by substantial evidence. The question that remains is whether there is

9   sufficient evidence to show that a substantial factor or contributing cause in the

10  Global Defendants not hiring or firing local workers was because of their race.

11      Unlike most discrimination cases, the sub-classes claiming discrimination

12  were not defined by race: the classes were local workers that were not hired and

13  local workers that were fired. Under the regulations of the H-2A program, the

14  Global Defendants had to offer work to and hire the local work force before

15  bringing foreign workers into the United States. The regulations contemplate that

16  the H-2A offer to local workers be made through the state work force office. 20

17  _____

18  ("DOL") for certification that

19      (A) there are not sufficient workers who are able, willing and qualified, and

20  who will be available at the time and place needed, to perform the labor or services

21  involved in the petition, and

22      (B) the employment of the aliens in such labor or services will not adversely

23  affect the wages and working conditions of workers in the United States similarly

24  employed.

25  *Id.*; *see also* 20 C.F.R. § 655.90.

26      Absent this two-fold showing, no certification will issue, and the petitioner's

27  H-2A application will not be approved. *See* 8 U.S.C. § 1188(a)(1); 20 C.F.R. §

28  655.90(b)(2).

**FINDINGS OF FACT AND CONCLUSIONS OF LAW ON PLAINTIFFS'**
**CLAIMS AGAINST GROWER DEFENDANTS; ORDER ADDRESSING**
**GLOBAL'S POST-TRIAL MOTIONS ~ 8**

C.F.R. § 655.101(c)(4).[4]  People that were unemployed came to the state work force office and were told about the Global job being offered pursuant to the H-2A program.

The local work force in the Yakima area is about 60 to 70% Hispanic, with the remainder consisting of other ethnic groups.  Thus, the local worker class consisted of any local worker that was offered work or hired by Global Horizons, regardless of their ethnicity.  *See* Ct. Rec. 731, Jury Instruction No. 12.  In this case, one of the sub-classes is local workers that attended the orientation sessions for the Global job offer at the state work force office and were offered a job, but were not hired.  The other two sub-classes consisted of local workers that went to work for Global Horizons and were fired.

In typical discrimination cases, the favored class of employee is defined by race, gender, or age—for instance, Caucasians, men, or young people.  In this case, the alleged favored workers were simply foreign workers.  The foreign workers involved in this case were from Thailand, although Global Horizons hired workers from other foreign countries for other contracts in other states.  Thus, the disfavored class and the favored class were defined by the H-2A program, and were not based upon impermissible racial characteristics.  Because the local workers included 30-40% non-Hispanic workers, one would expect the discrimination against Hispanic local workers to result in the hiring of a disproportionate number of non-Hispanic local workers.  There was no evidence that Global favored non-Hispanic local workers in the hiring and firing process.  No evidence was presented that Global contacted non-Hispanic local workers to work, rather than contact the Hispanic local workers.   Rather, the evidence was

---

[4]The local office will prepare an "agricultural clearance order," which, following the acceptance of the employer's application for consideration, is used to recruit local workers through an interstate clearance system.  *Id.*

**FINDINGS OF FACT AND CONCLUSIONS OF LAW ON PLAINTIFFS' CLAIMS AGAINST GROWER DEFENDANTS; ORDER ADDRESSING GLOBAL'S POST-TRIAL MOTIONS ~ 9**

that Global failed to hire local workers as a group, regardless of their race, in favor of hiring foreign workers.

The evidence showed that Global favored the hiring of foreign workers over local workers and fired local workers to permit foreign workers to take their place. There was no testimony by any class member that race was a reason that Global did not hire or fired them. In fact, Plaintiffs' evidence showed that Global had a strong economic motive to favor foreign workers, in that its President, Mordechai Orian, was paid $8,000 for every foreign worker hired. He was paid nothing for local workers hired. According to Plaintiffs' witnesses, Global favored all foreign workers over all local workers, whether the jobs were in Washington or elsewhere. Moreover, Plaintiffs' witnesses established that Global needed to keep its hired foreign worker crews busy once they arrived in the United States and would move them from job to job to keep them employed. Global moved foreign workers from other states to Washington without complying with the H-2A regulations and, in doing so, denied jobs to local workers. Global had to pay the living expenses of the foreign workers and pay them wages once they were in the United States, even if not fully employed. Local workers paid their own subsistence and were not paid by Global if laid off. This evidence presented a strong case that the Global Defendants abused the H-2A program and breached the contracts offered to local workers, and had an economic incentive to do so.

To make the case that race was a significant or motivating factor, Plaintiffs relied on two types of evidence. The first is that local workers were treated differently than foreign workers.

Global had two types of employees. The foreign workers were captives of Global. They remained in the custody of Global, lived in housing provided by Global, used Global buses for transportation to and from the job, were paid even if not working, and had no choice to seek other employment in this country. If they

did not want to work for Global, they were sent back to Thailand.

The local workers lived at home, commuted to the job, could decide to quit, could negotiate for better wages, and could change jobs without any penalty. The difference in treatment of the two classes of workers by Global is explained by the different circumstances of the two classes and the proven preference of Global to use foreign workers. While ordinarily the different treatment of workers can give rise to an inference of discrimination, the inference does not fit well in this case. The differences were driven and explained by the different circumstances of the foreign and local workers and the requirements of the H-2A regulations. While the bulk of the local worker class was Hispanic and the foreign workers were from Thailand, the different treatment is explained by factors other than race.

The only evidence of the firing of local workers, as opposed to being laid off at the end of a particular job, occurred in the gala apple harvest and the pear harvest in August 2004. Two local crews comprised of Hispanic workers were laid off. Thai crews were brought in to complete the work. The reasons for the dismissal of the crews were disputed and complicated. None of the direct evidence, however, suggested that the reason the local workers were fired was because of race. The local crew was composed of Hispanics and were replaced by a Thai crew. It is not clear to the Court that the Thai crew performed any better or worse than the local crew. While such evidence shows a breach of contract, the replacement by foreign workers, that happen to be Thai, does not establish that race was a motiving or substantial factor in the firing of the local crew. While it is possible that a jury could make such an inference, to the Court it only shows that the H-2A program was abused and Global may have wrongfully fired the local workers. The normal inference made from different treatment of different racial groups does not fit well in the explanation of the employment decisions made in this instance.

**FINDINGS OF FACT AND CONCLUSIONS OF LAW ON PLAINTIFFS' CLAIMS AGAINST GROWER DEFENDANTS; ORDER ADDRESSING GLOBAL'S POST-TRIAL MOTIONS ~ 11**

The second type of evidence relied upon by Plaintiffs are racial comments made by Defendant Mordechai Orian, President of Global Horizons.  Three witnesses testified about racially-charged statements attributed to Mr. Orian: Ebony Williams, Bruce Steen, and Jose Cuevas.

Ebony Williams worked for Global in its operations in Washington and Texas.  She described Global's process of "getting rid of the local workers as we can get the H-2A approval."  She said that Mr. Orian's objective was to discourage local workers from working for the two growers in Washington State.  She said that Orian characterized the local workers in Washington State as lazy, drunks, and drug users, and that local workers filed too many workers' compensation claims. She described the process of eliminating local workers so that foreign workers could work, but she never said that the workers were eliminated because of race. She testified that, in fact, the same process was used by Global in other markets, the racial composition of which is unknown.

Bruce Steen testified to Orian's and Global's preference for foreign workers. He testified that Orian said that he did not use Mexican foreign workers because growers had had bad experiences with Mexican labor. This statement was not connected to any event in Washington and it is not an expression of Orian's personal belief.  It is  an expression of the experiences of others.

The most significant anecdotal evidence is that of Jose Cuevas, an employee of Global during the performance of the contracts in Washington State.  He testified to a conversation that he overheard between Orian and Jim Morford in which Orian compared the work of the Thai crews and the local Hispanic crews. In his testimony, Cuevas used the words "local worker," "Mexican,"  and "Hispanic" interchangeably in describing Orian's statements.  According to Cuevas, Orian made the following observations:  the Thai crews were hard workers, there was no discussing things with them, they only liked to work hard,

and they were very happy to be here working.  In contrast, he said that the local people (Hispanics) didn't like to work and didn't want to work.  Orian said that the Hispanics were putting a lot of pretexts as far as working, they would ask many questions about how much they were going to be paid or how much they were going to work, they sometimes missed a lot of work, they would quit for any simple reason; therefore Orian preferred people from Thailand.

Global's president used classic racial group stereotypes in an effort to induce the Grower defendants to use the foreign workers during the work season. He used similar arguments  to motivate the local growers to enter into labor contracts with Global.  The manner in which this testimony was elicited detracted from its weight and significance to the Court, however.  Cuevas had to be led into equating the local workers with Hispanics.  Because the local crews were composed of Hispanic workers, it was simple to interchange the terms; one giving rise to discriminatory racial intent and the other giving rise to discrimination based on locality.  The evidence convinced the Court that the bias was based on the H-2A classifications and not on race.

The Court has reviewed this evidence and concludes that race was not a motivating or substantial factor in the hiring and firing decisions of the Global Defendants.  The Court concludes that Orian's statements were a means to accomplish his desire to use foreign workers over local workers, regardless of race or national origin.

The Court also concludes that race was not a motiving or substantial factor in any relevant employment decision made by the Grower Defendants.  Accordingly, the claims against the Grower Defendants for racial discrimination are dismissed.[5]

----

[5]Because the Court concludes that the Global Defendants did not discriminate it is not necessary to address whether the Grower Defendants are joint

**FINDINGS OF FACT AND CONCLUSIONS OF LAW ON PLAINTIFFS' CLAIMS AGAINST GROWER DEFENDANTS; ORDER ADDRESSING GLOBAL'S POST-TRIAL MOTIONS ~ 13**

1

**B.     The Global Defendants' Motion for Judgment as a Matter of Law**

Although the Court has come to its own conclusion that the Global

Defendants did not discriminate against the Plaintiff sub-classes on the basis of

race, it cannot substitute its own judgment for the judgment of the jury, which

found that the evidence supported a finding of racial discrimination by the Global

Defendants. *Johnson v. Paradise Valley Unified Sch. Dist.*, 251 F.3d 1222, 1227

(9th Cir. 2001).  When faced with a motion for judgment as a matter of law, the

Court must make every inference from the evidence in favor of the Plaintiff, the

non-moving party. *Summers v. Delta Air Lines, Inc.,* 508 F.3d 923, 925 n.1 (9th

Cir. 2007).  The standard to be applied in reviewing the jury's verdict is whether it

is supported by substantial evidence. *Id.*

The Court did not infer discrimination by the Global Defendants from the

different treatment of foreign workers and local workers for the reasons stated.  On

_____

employers.  Although the Ninth Circuit has not addressed this issue squarely, the

Court concludes that agency principles would apply to determine whether the

Grower Defendants could be held liable for the discriminatory actions of the

Global Defendants.  *See Aguello v. Conoco*, 207 F.3d 803 (5th Cir. 2000).  To this

end,  based on the evidence presented at trial, the Court concludes that for purposes

of § 1981 liability, the Global Defendants were not agents of the Grower

Defendants; rather the Global Defendants operated an independent contractors.

Also, in *Kolstad v. American Dental Ass'n*, 527 U.S. 526 (1999), the Supreme

Court placed strict limits on the extent to which an agent's misconduct may be

imputed to the principal for purposes of awarding punitive damages.  *Id.* at 542.

The Court finds that none of the exceptions set forth in *Kolstad* apply to the case at

bar, and consequently the Grower Defendants should not be vicariously liable for

the punitive damages awarded against the Global Defendants.

**FINDINGS OF FACT AND CONCLUSIONS OF LAW ON PLAINTIFFS'
CLAIMS AGAINST GROWER DEFENDANTS; ORDER ADDRESSING
GLOBAL'S POST-TRIAL MOTIONS ~ 14**

the other hand, the jury was entitled to make such inferences if it chose to do so.  In like manner, the Court was not persuaded that the racial comments of Orian established racial discrimination in this case.  On the other hand, the jury could do so.  The use of racial stereotypes has been a traditional method of justifying discrimination in all phases of public and private life.  The jury could have found racial animus on the part of the Global Defendants from the use of such stereotypes.  The Court was not persuaded by the testimony of Plaintiffs' expert concerning the lack of a financial explanation for Global's decision to fire the local crews in the apple and pear harvest.  The jury could have reached a different conclusion.

Based on the evidence presented at trial, the jury could have concluded that Global's racial bias against Hispanic workers in the Yakima Valley caused it to hire and fire local workers.  Accordingly, there is substantial evidence to support the jury verdict and it is not against the clear weight of the evidence.

**3.    Whether Defendant Mordechai Orian Can Be Held Individually Liable**

Defendants argue that there is no legal or evidentiary basis to support a finding of individual liability against Defendant Orian.[6]  Defendants argue that an

---

[6]The jury was instructed that an officer of a corporation is responsible for his own acts and for the acts of the corporation that violates the Farm Labor Contractor Act, Section 1981, or the Washington Law Against Discrimination if the officer was personally involved or intentionally caused the corporation to violate these laws.  (Ct. Rec. 731, Instruction No. 11.1).  The jury found that Mordechai Orian violated the Farm Labor Contractors Act by failing to employ or by discharging the Plaintiff sub-classes in violation of the applicable clearance orders and that he violated 42 U.S.C. § 1981 and the Washington Law Against Discrimination.  In so instructing the jury, the Court had concluded that an individual could be held liable

**FINDINGS OF FACT AND CONCLUSIONS OF LAW ON PLAINTIFFS' CLAIMS AGAINST GROWER DEFENDANTS; ORDER ADDRESSING GLOBAL'S POST-TRIAL MOTIONS ~ 15**

individual cannot be held liable for the corporation's act of discrimination, unless the plaintiff can show that the corporate veil should be pierced.  This is not a correct statement of the law with regard to § 1981 discrimination.  Instead, case law holds that an employee can be held individually liable if the employee was personally involved in the discrimination, if they intentionally caused the corporation to discriminate, or if they authorized, directed, or participated in the alleged discriminatory conduct.  *See Bell v. Clackamas County*, 341 F.3d 858, 867 (9th Cir. 2003) (upholding jury verdict imposing individual liability against defendants under 42 U.S.C. § 1981, without discussion); *see also Whidbee v. Garzarelli Food Specialties*, *Inc.*, 223 F.3d 62, 75 (2nd Cir. 2000); *Allen v. Denver Pub. Sch. Bd.*, 928 F.2d 978, 983 (10th Cir. 1991) (overruled on other grounds by *Kendrick v. Penski Transp. Serv., Inc.*, 220 F.3d 1220 (10th Cir. 2000); *Jones v. Continental Corp.*, 789 F.2d 1225, 1231 (6th Cir. 1986); *Al-Khazraji v. St. Francis College*, 784 F.2d 505, 518 (3rd Cir. 1986)*; Tillman v. Wheaton-Haven Recreational Ass'n.*, 517 F.2d 1141, 1146 (4th Cir. 1975).  Likewise, under the Washington Law Against Discrimination, "a supervisor acting in the interest of an employer who employs eight or more people can be held individually liable for his or her discriminatory acts."  *Brown v. Scott Paper Worldwide Co.*, 143 Wash.2d 349, 358 (2001).

Thus, there is a legal basis to support a finding of individual liability against Defendant Orian.  There is also an evidentiary basis, as explained above.  There was sufficient evidence introduced at trial for the jury to find that Defendant Orian was personally involved or intentionally caused the corporation to discriminate.  As such, the jury verdict finding Defendant Orian personally liable for acts of

under § 1981 and the Washington Law Against Discrimination, and reserved the issue of whether an individual could be liable under the Farm Labor Contractor Act to be determined through post-trial motions.

**FINDINGS OF FACT AND CONCLUSIONS OF LAW ON PLAINTIFFS' CLAIMS AGAINST GROWER DEFENDANTS; ORDER ADDRESSING GLOBAL'S POST-TRIAL MOTIONS ~ 16**

1    discrimination must be upheld.

2         Whether Defendant Orian can be held liable for all Farm Labor Contractor

3    Act ("FLCA") violations proven at summary judgment and at trial is a more

4    difficult question.[7]

5         Plaintiffs argue that because Orian had complete control of all the business

6    of Global Horizons in 2004 and now, he is personally liable for all FLCA

7    violations at trial and proven at summary judgment.  In support of their position,

8    Plaintiffs cite to a district court case involving the Migrant and Seasonal

9    Agricultural Worker Protection Act "(AWPA"), a federal statute that is analogous

10   to the Washington Farm Labor Contractor Act, which was the basis for Plaintiffs'

11   claims at trial (Ct. Rec. 630 p. 39).  However, this case, *Avila v. A. Sam & Sons*,

12   856 F.Supp. 763 (W.D. N.Y. 1994), provides no insight as to whether Defendant

13   Orian should be held individually liable for FLCA violations.  In *Avila*, the district

14   court held the owners of a farm operation were "agricultural employers" as defined

15   by the AWPA.  *Id.* at 769.[8]   A finding that owners of the farm were "agricultural

16   employers" is irrelevant to determining whether Mordechai Orian is individually

17   liable as a farm labor contractor under the FLCA.

18        The Court rejects Plaintiffs' argument that they need only show that Orian

19   had complete control of all the business of Global Horizons in order to be held

20   _____

21        [7]In this regard, Defendants' argument regarding piercing the corporate veil

22   in relations to individual liability for FLCA violations is applicable.

23        [8]Under the AWPA, an "agricultural employer" is defined as any person who

24   owns and operates a farm and who recruits, transports or employs migrant workers.

25   29 U.S.C. § 1801(2).  AWPA sets forth duties for agricultural employers regarding

26   housing, disclosures, transportation, recording keeping, as well as prohibiting

27   agricultural employers from providing false information.  *See* 29 U.S.C. §§

28   1821(a)-(g), 1823(a).

**FINDINGS OF FACT AND CONCLUSIONS OF LAW ON PLAINTIFFS'
CLAIMS AGAINST GROWER DEFENDANTS; ORDER ADDRESSING
GLOBAL'S POST-TRIAL MOTIONS ~ 17**

personally liable for all FLCA violations.  Under FLCA, a "'farm labor contractor' means any person, or his or her agent or subcontractor, who, for a fee, performs any farm labor contracting activity."  Wash. Rev. Code § 19.30.010(2).  A "person" includes any individual, firm, partnership, association, corporation, or unit or agency of state or local government."  §19.30.010(1).  "Farm labor contracting activity" means recruiting, soliciting, employing, supplying, transporting, or hiring agricultural employees. § 19.30.010(3).

Notably, the statute requires that a farm labor contractor obtain a license. Indeed, the failure to obtain a license can lead to criminal charges as well as civil penalties.  It is logical, then, to conclude that in order to be held individually liable under the statute, the individual, at a minimum, would need to meet the definition of a farm labor contractor.

Also, section 19.30.110 provides the duties required of a farm labor contractor.  Specifically, this section begins: "Every person *acting as a farm labor contractor* shall: . . ." (Emphasis added).  Section 19.30.120 sets forth the prohibited acts of a farm labor contractor.  This section begins: "No person *acting as a farm labor contractor* shall: . . ."  (Emphasis added).   Thus, in order to be held individually liable under the FLCA, under the plain meaning of the statute, a person has to be acting as a farm labor contractor, which means "recruiting, soliciting, employing, supplying, transporting, or hiring agricultural employees." § 19.30.010(3).

Here, Plaintiffs did not argue that Mordechai Orian personally acted as a farm labor contractor, or that he personally needed to obtain a license under FLCA. *See Escobar v. Baker*, 814 F.Supp. 1491, 1499 (W.D. Wash. 1993) (looking at whether the individual performed any farm labor contracting activity for a fee to determine whether individual was a farm labor contractor under AWPA and FLCA and holding that FLCA disclosure requirements only apply to farm labor

**FINDINGS OF FACT AND CONCLUSIONS OF LAW ON PLAINTIFFS' CLAIMS AGAINST GROWER DEFENDANTS; ORDER ADDRESSING GLOBAL'S POST-TRIAL MOTIONS ~ 18**

contractors).  Nor was there any evidence produced at trial that Defendant Orian personally acted as a farm labor contractor.

Also, the claims based under the FLCA do not sound in tort law, rather, the basis of the claims under the FLCA are contract law.  Plaintiffs did not allege the piercing of the corporate veil theory in its complaint or at trial.  No evidence was presented in support of piercing the corporate veil.

The Court finds as a matter of law that Mordechai Orian cannot be held individually liable for violations of the FLCA.

**4.    Whether Plaintiffs Were Required to Provide an Opt-Out Notice to Absent Class Members**

Defendants argue that the judgment awarded against the Plaintiff sub-classes must be vacated because no opt-out notice was given to the absent class members.

The initial class certification question was addressed by Judge Leavitt (Ct. Rec. 136).  Plaintiffs had moved for class certification primarily under Rule 23(b)(2)[9] and secondarily under Rule 23 (b)(3).[10]  Judge Leavitt found that Plaintiffs' claims for declaratory or injunctive relief were the predominant relief sought and certified the class under Rule 23(b)(2).  In the alternative, Judge Leavitt also found that it was appropriate to certify the class action under Rule 23(b)(3), finding that common questions of fact and law predominate over the individual issues presented in the dispute and that class treatment is a superior form of relief.

---

[9]Fed. R. Civ. P. 23(b)(2) provides that an action may be maintained as a class action if "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole."

[10]To bring an action under Fed. R. Civ. P. 23(b)(3), Plaintiffs must show that there are common questions of law or fact that predominate over the individual issues and class treatment is a superior form of relief.

**FINDINGS OF FACT AND CONCLUSIONS OF LAW ON PLAINTIFFS'
CLAIMS AGAINST GROWER DEFENDANTS; ORDER ADDRESSING
GLOBAL'S POST-TRIAL MOTIONS ~ 19**

1  Defendants now seek to undo this order, arguing that because Plaintiffs

2  appear to have abandoned their claims for injunctive and declaratory relief, and

3  monetary damages predominate, the Court should find that the class certification

4  should not have been certified under Rule 23(b)(2).  The implications for doing so

5  are significant.  Under Rule 23(b)(2), no opt-out notice is required.  Under Rule

6  23(b)(3), opt-out notice is required.   According to Defendants, the failure to

7  provide opt-out notice requires that the judgment entered in favor of the absent

8  class members be vacated.

9  The Court has broad discretion to determine whether a class should be

10  certified and to revisit that certification throughout the duration of the proceedings

11  before the Court.  *Dukes v. Wal-Mart, Inc.*, 509 F.3d 1168, 1176 n.1 (9th Cir. 2007)

12  ("[D]istrict courts retain the authority to amend or decertify a class if, based on

13  information not available or circumstances not anticipated when the class was

14  certified, the court finds that either is warranted.").

15  Here, under *Dukes*, certification under Rule 23(b)(2) was proper, even if

16  Plaintiffs were seeking class-action damages, including punitive damages.  *Id.* at

17  1186 (holding that class action can be certified under Rule 23(b)(2) even if the

18  class seeks claims for monetary damages "so long as such damages are not the

19  predominant relief sought, but instead are secondary to the primary claim for

20  injunctive or declaratory relief.")  The Court does not find that the case has

21  somehow changed to disturb Judge Leavitt's ruling that the above-captioned case

22  was primarily certified under Rule 23(b)(2).  Accordingly, Plaintiffs' Motion to

23  Amend Judgment (Ct. Rec. 859) will be granted.  By agreement of the parties and

24  without objection, the description of the classes was changed when the jury was

25  instructed.  Accordingly, the Court will amend the judgment to include the

26  definitions of the three subclasses of Plaintiffs that were presented to the jury in

27  Instruction No. 12.

28

**FINDINGS OF FACT AND CONCLUSIONS OF LAW ON PLAINTIFFS' CLAIMS AGAINST GROWER DEFENDANTS; ORDER ADDRESSING GLOBAL'S POST-TRIAL MOTIONS ~ 20**

**5.    Whether Plaintiffs' Award for Emotional Distress is Supported by the Evidence**

The jury awarded Plaintiff Betencourt $2,500 for emotional distress; Plaintiff Perez-Farias $5,000 for emotional distress; and Plaintiff Sanchez $4,000 for emotional distress.

Defendants argue that there is not sufficient evidence to support the jury award of damages for emotional distress.  Defendants argue that none of the Plaintiffs testified that they had reason to believe that they were fired because of race.

A jury's award of damages should not be disturbed unless it is clearly unsupported by the evidence, and unless the amount is "grossly excessive or monstrous."  *Zhang*, 339 F.3d at 1040; *Chalmers v. City of Los Angeles*, 762 F.2d 753, 760 (9th Cir. 1985).  Non-economic damages may be awarded for humiliation and emotional distress established by testimony or inferred from the circumstances. *Id.*; *Johnson v. Hale*, 940 F.2d 1192, 1193 (9th Cir. 1991).  "No evidence of economic loss or medical evidence of mental or physical symptoms stemming from the humiliation need be submitted."  *Id.*  Section 1981, however, does not provide for automatic or presumptive damages.  *Azimi v. Jordan's Meats, Inc.*, 456 F.3d 228, 234 (1st Cir. 2006).

Under Washington law, the jury's role in determining non-economic damages is entitled to a presumption of correctness.  *Bunch v. King County Dept. of Youth Services*, 155 Wash.2d 165, 179 (2005).  Once a plaintiff has proven discrimination under the Washington law, he or she does not need to prove outrageous or extreme conduct or severe emotional distress.  *Dean v. Municipality of Metro. Seattle-Metro*, 104 Wash.2d 627, 640 (1985).  The jury can rely on the plaintiff's own testimony regarding emotional distress, and it is not necessary to present medical testimony in order to obtain an award for emotional distress.

*Bunch,* 155 Wash.2d at 179.

Plaintiff Perez-Farias testified regarding his feelings about being fired. He started working for Global Horizons in the first part of February 2004 and continued to work until August 2004. In August 2004, he was working in the pear harvest. There was a dispute regarding the amount of pay the workers were to receive for picking the pears. The workers were seeking $24 a bin, while Global offered $13 a bin. The workers walked off the job. The next day, they were told that there was not any work for them. Plaintiff Perez-Farias testified that it was a sad thing when he got fired, and he worried about paying the bills. He also testified that he was able to find work after a few days in a warehouse.

Plaintiff Jose Sanchez testified that he began work with Global Horizons in January 2004, and was discharged in August 2004, while he was picking Gala apples. He testified that he felt a little humiliated and maybe discriminated against because he knew that there were people that continued to work at the orchard. He believed that he was a good worker and it made him feel bad to not be asked to come back to work. He testified that he had never been fired from any place, and had never been told in any of his jobs that he was not doing his work. He testified that within a week he was able to find work picking pears.

Plaintiff Ricardo Betancourt applied for a job with Global Horizons, but was never called to go to work after he was told he was hired. He stated not being called back to work did not feel good to him because he lost fifteen days of work just waiting for an answer and he was concerned about having to pay the bills.

To be fired or rejected for hiring because of race is bound to cause some emotional distress. The Court finds that each Plaintiff provided evidence of emotional distress that was caused by Defendant's actions, and the evidence is legally sufficient to withstand a motion for judgment as a matter of law.

**6.    Whether Plaintiffs Were Required and Failed to Prove They Were**

**FINDINGS OF FACT AND CONCLUSIONS OF LAW ON PLAINTIFFS' CLAIMS AGAINST GROWER DEFENDANTS; ORDER ADDRESSING GLOBAL'S POST-TRIAL MOTIONS ~ 22**

**Entitled to Work in the U.S. Legally**

Defendants argue that nothing was put forward in the trial to support a claim that Plaintiffs were United States citizens or that they were legally entitled to work in the United States. Defendants argue that the Court should conclude that the plaintiff class representatives are not U.S. citizens and that they are not eligible to work in the United States, and consequently, that Plaintiffs are foreclosed from seeking damages for breach of the labor certification contracts.

At trial, Plaintiffs Betancourt and Perez-Farias testified that they were legally authorized to work in 2004 and Plaintiff Sanchez testified that he was a United States citizen. Defendants did not present any evidence to the contrary. Plaintiffs' testimony is sufficient to establish their right to bring a breach of contract claim under the clearance orders. Any class member that seeks to prove damages at a later proceeding will have to show that they are qualified to work. An illegal alien is not qualified to work under the clearance orders.

**7.    Whether Plaintiffs' FLCA Claims are Preempted by the H-2A Statutes and Regulations**

The Global Defendants argue that Plaintiffs are prevented from bringing claims under the AWPA and FLCA because Plaintiffs' violations are governed by the Immigration Reform and Control Act ("IRCA") and cannot be privately enforced. In support of their position, the Global Defendants argue that the H-2A statute is the sole remedy available to Plaintiffs for violations of the clearance order; the AWPA does not apply where there is co-employment of domestic and foreign labor, as this type of employment activity is governed exclusively by immigration law; and the state FLCA laws are preempted by federal immigration law.

Defendant does not cite any case law with regard to its first argument, namely that the AWPA does not apply in cases involving the H-2A statues and

**FINDINGS OF FACT AND CONCLUSIONS OF LAW ON PLAINTIFFS' CLAIMS AGAINST GROWER DEFENDANTS; ORDER ADDRESSING GLOBAL'S POST-TRIAL MOTIONS ~ 23**

regulations.  On the contrary, courts have repeatedly found that domestic farm workers who sought employment or were employed by employers using foreign laborers under the H-2A program were entitled to pursue claims for violations of their rights under AWPA.  *See Malacara v. Garber,* 353 F.3d 393 (5th Cir. 2003)*; Donaldson v. U.S. Dep't of Labor*, 930 F.2d 339, 349-50 (4th Cir. 1991); *Vega v. Nourse Farms*, 62 F.Supp.2d 334, 346 (D. Mass. 1999); *Villalobos v. North Carolina Growers Assoc., Inc.*, 42 F.Supp.2d 131, 137-8 (D.P.R. 1999); *Marquis v. United States Sugar Corp.*, 652 F.Supp. 598, 600 (S.D. Fla 1987); *see also Arriaga v. Florida Pac. Farms, L.L.C.*, 305 F.3d 1228, 1235 (11th Cir. 2002) (holding that the Fair Labor Standards Act (FLSA) applied to farmworkers who were employed in the United States pursuant to the H-2A program, relying on 20 C.F.R. § 6555.103(b), which states that "[d]uring the period for which the temporary alien agricultural labor certification is granted, the employer shall comply with applicable federal, State, and local employment-related laws and regulations.").

The Court finds that the state FLCA is not pre-empted by the H-2A regulations.  "Federal preemption occurs when: (1) Congress enacts a statute that explicitly pre-empts state law; (2) state law actually conflicts with federal law; or (3) federal law occupies a legislative field to such an extent that it is reasonable to conclude that Congress left no room for state regulation in that field."  *Engine Mfrs. Ass'n v. South Coast Air Quality*, 498 F.3d 1031, 1039 (9th Cir. 2007) (citations omitted).  "Preemption analysis 'start[s] with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.' " *Id.* (citations omitted).

No provision in IRCA expressly preempts state law providing employment protections to migrant workers.  IRCA's express preemption clause applies only to "any State or local law imposing civil or criminal sanctions" on persons who

**FINDINGS OF FACT AND CONCLUSIONS OF LAW ON PLAINTIFFS' CLAIMS AGAINST GROWER DEFENDANTS; ORDER ADDRESSING GLOBAL'S POST-TRIAL MOTIONS ~ 24**

1  employ or assist in the employment of illegal aliens.  8 U.S.C. § 1324a(h)(2).

2  Defendants have not shown that FLCA conflicts with IRCA.  To do so, Defendants

3  must show that compliance with both FLCA and IRCA is physically impossible, or

4  that FLCA stands as an obstacle to the accomplishment and execution of the full

5  congressional purposes of objectives stated in IRCA.  *Center for Bio-Ethical*

6  *Reform, Inc. v. City of and County of Honolulu,* 455 F3d 910, 916 (9th Cir. 2006).

7  Defendants have not shown that compliance with both FLCA and IRCA is a

8  physically impossibility, nor do the remedies provided in the FLCA stand as a

9  direct and positive obstacle to IRCA's objectives.

10      Defendants attempt to argue that Congress intended to occupy the field of

11  immigration when it passed the IRCA.  The Court agrees that immigration is a field

12  in which the federal interest dominates.  However, state labor laws occupy an

13  entirely different field.  "Where . . . the field which Congress is said to have pre-

14  empted includes areas that have been traditionally occupied by the States,

15  congressional intent to supersede state laws must be clear and manifest."  *English*

16  *v. Gen. Elec. Co.*, 496 U.S. 72, 79 (1990).  Here, there is not clear intent of

17  Congress to occupy the field of immigration to the exclusion of state regulation of

18  labor and employment of migrant workers.  The Court concludes that the IRCA

19  does not preempt Plaintiff's claim for breach of contract with regard to the

20  clearance orders.

21  ///

22  **8.    Conclusion**

23      The Court finds that there was substantial evidence to support the jury

24  verdict finding racial discrimination by the Global Defendants.  The Court also

25  finds that Defendant Mordechai Orian can be held individually liable for racial

26  discrimination, and finds that there was substantial evidence to support the jury

27  verdict finding that he intentionally discriminated against the Plaintiff sub-classes.

28

**FINDINGS OF FACT AND CONCLUSIONS OF LAW ON PLAINTIFFS'
CLAIMS AGAINST GROWER DEFENDANTS; ORDER ADDRESSING
GLOBAL'S POST-TRIAL MOTIONS ~ 25**

The Court finds that Defendant Orian could not be held individually liable under the FLCA.  The Court finds that Plaintiffs presented evidence of emotional distress and declines to disturb the jury's award of damages for emotional distress.  The Court finds that Plaintiff's FLCA claims are not preempted by the H-2A statutes and regulations.

In reviewing the evidence presented at trial, the Court concludes that the Global Defendants did not intentionally discriminate against the Plaintiff sub-classes, which in turn negates any liability on the part of the Grower Defendants.

The Court declines to disturb Judge Leavitt's order on class certification.  As such, the judgment entered against the Global Defendants is binding on all class members.  In the same light, the Court grants Plaintiffs' Motion to Amend Judgment to include the description of the class members.

Accordingly, **IT IS HEREBY ORDERED**:

1.  Defendants' Motion for Judgment as a Matter of Law (Ct. Rec. 701) is **DENIED**.

2.  Defendants' Motion for Judgment as a Matter of Law (Ct. Rec. 794) is **DENIED**.

3.  Defendants' Motion for Judgment as a Matter of Law (Ct. Rec. 797) is **GRANTED**, in part, and **DENIED**, in part.

4.  Defendants' Motion for Judgment as a Matter of Law (Ct. Rec. 799) is **DENIED**.

5.  Plaintiffs' Motion to Strike Global Defendants' Pleading (Ct. Rec. 820) is **DENIED**.

6.  Plaintiffs' Motion to Amend Judgment (Ct. Rec. 859) is **GRANTED**.

7.  Plaintiffs' claims of racial discrimination under 42 U.S.C. § 1981 and the Washington Law Against Discrimination asserted against the Grower Defendants are **dismissed** with prejudice.

8.   In two weeks from the date of this order, the Judgment entered on October 23, 2007 (Ct. Rec. 767) will be amended to include the following description of the members of the class:

Denied Work Subclass:  U.S. Resident farm workers who claim they were offered employment, but were not employed by Global Horizons.

Green Acre Subclass: U.S. Resident farm workers who were employed with Global Horizons at Green Acre Farms in 2004.

Valley Fruit Subclass: U.S. Resident farm workers who were employed with Global Horizons at Valley Fruit Orchards in 2004.

9.   If any one objects to the wording of the amended judgment, they are directed to file their opposition within 10 days from the date of this order.  If no opposition is filed, the Court will amend the Judgment as set forth above.

**IT IS SO ORDERED.**  The District Court Executive is directed to enter this Order and to provide copies to counsel.

**DATED** this 26th   day of March, 2008.


*s/Robert H. Whaley*

ROBERT H. WHALEY
Chief United States District Court


Q:\CIVIL\2005\Perez-Farias, et al\ffclmotions.wpd

**FINDINGS OF FACT AND CONCLUSIONS OF LAW ON PLAINTIFFS'
CLAIMS AGAINST GROWER DEFENDANTS; ORDER ADDRESSING
GLOBAL'S POST-TRIAL MOTIONS ~ 27**